IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36759-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON ANTHONY DAVIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. —Jason Davis appeals convictions for residential burglary and theft in the second degree, challenging the sufficiency of the State's evidence to prove the required intent. Viewed in the light most favorable to the State, the evidence and permitted inferences were clearly sufficient. We affirm.

FACTS AND PROCEDURAL BACKGROUND

Sarah Joplin and Daiquiri Rock are co-owners of the Seasoned House, an event center located in Pullman. The business operates on the first floor of a building owned

by the two women; the second floor of the building is private space that includes a furnished bedroom apartment that is sometimes used by Ms. Rock.

Ms. Joplin traveled to the event center early in the morning of February 6, 2019, to shovel snow. She initially noticed an unusual number of footprints in the snow, including leading up the front stairs. She then noticed that a window to the left of the front door was broken and a rug that belonged on the floor of the entry way had been tacked up over the broken window opening.

The front door had no exterior key accessibility, so Ms. Joplin went to the back door, which she entered using a key pad. Upon entering, she saw Jason Davis standing directly across the room from her, looking at clocks on the wall and drinking a beer from her refrigerator. Ms. Joplin introduced herself and asked Mr. Davis if he had an appointment. Mr. Davis said he did; that "he was there to fix the clocks . . . to change the batteries." Report of Proceedings (RP) at 172. Ms. Joplin excused herself and went back outside, where she phoned Ms. Rock to find out if she had given Mr. Davis permission to be in the building. When Ms. Rock said she had not, Ms. Joplin called the police.

Two officers responded. Ms. Joplin let them into the building, and they located Mr. Davis in the upstairs bedroom apartment, where they placed him under arrest. While escorting Mr. Davis downstairs, one of the officers noticed that Mr. Davis had a ring that was only partially on his finger. Upon arriving downstairs, the officer searched Mr. Davis and found a plastic "baggy" in a pocket of Mr. Davis's jeans that contained a set of

2

gold earrings with green and clear stones that turned out to be emeralds and diamonds. The officer also searched Mr. Davis's backpack. Officers showed Ms. Joplin the ring, earrings, and a few other items found in Mr. Davis's possession, and she recognized the jewelry as belonging to Ms. Rock.

In walking through the building after Mr. Davis's arrest, Ms. Joplin noticed that many items were strangely out of place. Candles from a candelabra "had fallen out in the basement, upstairs in the shower, kind of everywhere in the house," furniture had been stacked, food items had been consumed, and the glass from the broken out window had been hidden under a rug. RP at 169-70. A drink had been made from blue curaçao, the bottle of which was missing. The bottle was found several weeks later, behind a temporary wall.

Mr. Davis was eventually charged with residential burglary, second degree theft, and third degree malicious mischief. At a two day jury trial, Ms. Joplin testified to the events of the morning of February 6 and identified Mr. Davis as the person she encountered in her and Ms. Rock's building. Ms. Rock identified her jewelry. The responding officers testified. A jewelry store owner testified that Ms. Rock's ring was worth about $100 and the earrings were worth about $3,000.

Mr. Davis testified in his own defense. He testified that he entered the Seasoned House after sitting on its porch for a while because it was "freezing outside and I didn't think I could handle it anymore." RP at 265. He claimed not to know the building was a

3

residence.  He would not concede that he broke the window, saying "I don't know if the window was—like the officer said, he had stepped on that glass.  Those were perfectly pieces of glass that would have been able to be put back in to the window. . . .  [T]hey were not broken."  RP at 265-66.  When asked about the property found on his person, Mr. Davis said, "I was going to take a picture and do an appraisal."  RP at 265.  He said it was not his intent to steal the ring, he just wanted to "take a picture of that ring and compare it or appraise it to [his acquaintance] Mrs. Stone's ring that she wears 24/7 that looked exactly like that."  RP at 266.

Mr. Davis testified "when the person had seen [him] and called [him] a ghost when she came in, the stuff was sitting next to [him] with the hammer."  RP at 268.  Mr. Davis said he took the jewelry "from the area where the clocks were not working to upstairs."  *Id.*  Mr. Davis said he was "not a hundred percent sure if" officers found the earrings in his pocket.  *Id.*  When asked if the ring was on his finger, Mr. Davis said, "the first time [he had] seen the ring it was on the ground."  *Id.*

The jury found Mr. Davis guilty as charged.  He appeals.

ANALYSIS

Mr. Davis contends on appeal that the State presented insufficient evidence of essential elements of residential burglary and second degree theft.  He emphasizes evidence of his "odd behaviors" while in the Seasoned House, suggesting that the evidence indicates only that he "acted strangely."  Br. of Appellant at 6-7.  He contends

the State failed to show that he intended to commit a crime inside the building as required for the burglary charge because he "only intended to seek shelter during a cold winter night." Br. of Appellant at 2. He contends it failed to show that he intended to deprive Ms. Rock of her earrings and ring as required for the theft charge, because he "intended to take photos of the jewelry found on his person, and . . . made no attempt to leave to remove property from the premises." *Id.*

Due process requires the State to prove all elements of a crime beyond a reasonable doubt. *State v. Washington*, 135 Wn. App. 42, 48, 143 P.3d 606 (2006). The well settled test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence are drawn in favor of the State and are interpreted most strongly against the defendant. *Id.*

"A person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, the person enters or remains unlawfully in a dwelling other than a vehicle." RCW 9A.52.025(1). Burglary does not require an intent to commit a specific crime; rather, it requires an intent to commit any crime against a person or property. *State v. Bergeron*, 105 Wn.2d 1, 4, 711 P.2d 1000 (1985). Intent to commit a crime may be inferred when a person enters or remains unlawfully. *State v. Cantu*, 156 Wn.2d 819, 826, 132 P.3d 725 (2006); *State v. Bishop*, 90 Wn.2d 185, 188-89, 580 P.2d

5

259 (1978). By statute, a person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein "unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent." RCW 9A.52.040.

"[A] person is guilty of theft in the second degree if he or she commits theft of: (a) Property or services which exceed(s) seven hundred fifty dollars in value but does not exceed five thousand dollars in value, other than a firearm as defined in RCW 9.41.010 or a motor vehicle." RCW 9A.56.040. Theft is defined as "wrongfully obtain[ing] or exert[ing] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020.

"Intent may be inferred from all the facts and circumstances surrounding the commission of an act or acts." *Bergeron*, 105 Wn.2d at 19. "Although intent may not be inferred from conduct that is patently equivocal, it may be inferred from conduct that plainly indicates such intent as a matter of logical probability." *Id.*

The obvious problem with Mr. Davis's claim of evidence insufficiency is that he views the evidence in the light most favorable to himself, not the State. The State presented evidence that he broke a window to enter a building without permission, rifled through the building and upstairs apartment, was found with Ms. Rock's ring and valuable earrings on his person, and when confronted by the owner of the property, lied about the reason he was present. The evidence was sufficient.

No. 36759-2-III
*State v. Davis*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.

7